**CONTINENTAL TRANSFER & STORAGE COMPANY, Inc., Appellant,**

v.

**MIDCITY REALTY COMPANY, Appellee.**

No. 15851.

Court of Civil Appeals of Texas.

Dallas.

June 2, 1961.

Rehearing Denied June 30, 1961.

Jack Keller, Dallas, for appellant.

C. C. Renfro, Dallas, for appellee.

WILLIAMS, Justice.

Midcity Realty Company sued Continental Transfer & Storage Company, Inc., seeking to cancel a lease agreement and also for damages. Plaintiff alleged that the lease agreement, covering a ware-

house building at Dallas, had been procured through fraudulent misrepresentations on part of the defendant's officers. Plaintiff, in the alternative, sued for alleged breach of the contract, such count of recovery being abandoned. Defendant denied the fraudulent representations and filed a cross-action, which cross-action was later abandoned. The case was tried to a jury which found: (1) that R. L. Taylor, President of Continental Transfer & Storage Co., Inc., represented to the executives of Midcity Realty Company that Continental would use and rent Midcity's company building so as to produce $2,500 to $6,000 per month storage income; (2) that the foregoing representation was false; (3) that such representation was made to induce Midcity to sign the lease involved; (4) that Midcity's executives believed and relied upon the truth of such representations in signing the lease involved; (5) that Midcity's executives would not have signed and executed the lease except for the representation inquired about in Issue No. 1; (6) that Continental has not used and rented the floor space involved as R. L. Taylor represented this would be used; (7) that the reasonable cash market value per month of the space was $2,000 per month. Upon this verdict the trial court decreed cancellation of the written lease agreement and also rendered judgment for the plaintiff's damages in the sum of $32,-431.82.

Appellant's principal contention, contained in its first four points on appeal, is that appellee had failed to prove and secure a finding from the jury one of the necessary elements of actionable fraud, namely, the question of bad intent or knowledge of untruth at the time the alleged fraudulent statement was made, and therefore, the trial court should have instructed a verdict for appellant or should have granted appellant's motion for judgment non obstante veredicto. In view of appellant's complaint that appellee had failed to prove its case of actionable fraud it becomes necessary for us to review the pleadings and testimony. In its trial petition appellee alleged that prior to March 29, 1958, R. L. Taylor, as President of Continental represented to appellee that Continental was using about 24,000 square feet of storage space in Dallas. It was alleged that Continental had a large active business; that the company was constantly growing larger and as a consequence it needed more space to handle its large volume of business. Continental had represented that the company had interstate commerce commission authority to operate in 36 states and had interline connections with 12 other states and had agents in 50 principal cities of the United States. It was then alleged that Taylor represented his company needed (1) a five year lease on approximately 50,000 square feet of space; (2) the company would need approximately 4,000 square feet for use as office space; and (3) that adequate advertising would be maintained. Further it was alleged: "the said Taylor further represented that such space could be easily used and rented so as to produce $2,500 to $6,000 per month and that his company was willing to rent such a space, and use it as indicated and pay to Midcity 50% of the income from the storage of household furniture and equipment and general merchandise." Furthermore: "The said Taylor also represented to the executives of Midcity that he knew from his own experience that the rentals from such space would produce from $2,500 to $6,000 per month storage income over a period of five years." Appellant pled that its officers believed the representation as being true that (1) it would use said space as represented; (2) that defendant would receive $2,500 to $6,000 per month on storage of goods, wares and merchandise; (3) that defendant would use the space as said Taylor represented and would pay plaintiff 50% of said income from the storage and (4) that Midcity's share thereof would be from $1,250 to $3,000 per month. Appellee then alleged that its officers, acting upon such representations and assurances made the lease-contract with appellant for a period of five years, said lease being at-

tached to the petition as an Exhibit. Further, appellant said: "Midcity says that at the time the executive officer made the representations and promises as set out above, he did so with the design and intention of deceiving the executives of Midcity, and further at such time said Taylor as a majority owner and managing executive of Continental had no intention of performing the promises and obligations set out above, but made them and used them merely for the purpose of inducing Midcity's executives to enter into the contract which is the subject of this suit."

The lease agreement between the parties, dated March 29, 1958 provided that Continental would lease Midcity's building located on Parry Street in Dallas, Texas, for a period of five years beginning April 1, 1958 and ending March 31, 1963. The lease provided that said property was leased on a percentage basis of 50% of all receipts and that in the event the receipts by the lessor, during the five year period, did not average $1,250 per month, lessor should have the right to cancel the lease. Continental represented that for the year 1958 Midcity's share was $734.55 and that for 1959 the income was $2,458.10 for the entire year.

R. L. Taylor, President of Continental Transfer & Storage Company, testified that prior to the lease negotiations with Midcity, Continental had an office in San Antonio, Texas and two warehouses there with 90,000 square feet of space; that they were doing business in 48 states; that they had a large number of tractors and trucks and other equipment. Taylor testified that he told the executives of Midcity that they needed a five year lease on approximately 50,000 square feet of additional space in Dallas; that Midcity had a three-story building on Parry Street with 54,000 square feet and that Taylor proposed a lease agreement whereby Midcity would get 50% of the gross receipts of the storage revenue. He denied that he told Midcity that he was certain as to how much they could put in and keep in that building. He said:

"I told them I would accept the building on a 50-50 proposition, where they would receive 50% of the gross storage revenue, and do everything within my power to put as much household goods, personal effects, and general merchandise in the building that I could, by properly advertising it and spending some time on it and everything necessary to do to store household goods." He said that he represented to Midcity that within a short time Continental would get the income up to the point where it would average $1,250 per month. He further testified that at the time the transaction was consummated that Continental had a warehouse space in Dallas, on Elm Street, consisting of about 24,000 square feet; that when the contract was signed this space was full. He further testified that prior to the time the lease was made that he told Mr. Parks, and others connected with Midcity, that it would be sometime before Continental could actually put the Midcity warehouse on a paying basis and that they would have to do some advertising and other work to build up the business in the new place. He said he explained to Parks that he had only been in the household goods storage business a short time and was not familiar with merchandise storage and that he did not know what he would do with it, but that he would do the best he could. He said that he told Parks, and the other officials of Midcity, that he did not believe that Continental could possibly put the warehouse on any kind of paying basis for a couple of years. He said that in his opinion if the lease arrangement had not been interrupted by the filing of the present lawsuit that the income during the period of five years would have averaged $1,250. About three months prior to the filing of the suit Mr. Parks told him that he was going to break the lease and that after the suit was filed he could not accept profitable storage which had been tendered. He testified that after the lease was signed and in March 1958 he moved two offices down to the Parry Street location and put in a telephone system, turned

on the lights, water and gas and had it insured. He had planned on moving his entire office and operation down to the Parry Street location and selling the Elm Street property. After moving his office to the Parry Street building he began to advertise the business both in the newspapers and on the radio. He also sent out several hundred letters to people in the warehouse business soliciting business. He ran newspaper ads beginning in June of 1958 for a period of over a year and he spent $12,000 for radio ads on Radio Station KLIF for a period of about a year. He also advertised in the telephone book. In addition to the advertising, all of which is illustrated in the supplemental statement of facts, Taylor testified that he hired a man and put him over the Parry Street operation to solicit business and operate the place of business. He said after the lease was signed that it took a month or perhaps two months to get the building cleaned up and ready for occupancy. Only the first two floors were eligible for Government storage since the third would not pass Government inspection on account of the wooden roof. He testified that the Elm Street building had remained full or practically full all of the time and that on occasions he had sent merchandise to the Midcity building when there was open space in their building on Elm Street.

Mr. B. R. Parks, President of Midcity Realty Company, testified that Taylor represented to him that Continental had a large operation; that they had trucks running all over the country; that they had connections in all places; that they needed places to store, especially the Government contracts; that they needed Midcity's building and would use two floors of it for Government storage. He said that Taylor represented to him that Continental and Midcity would each receive "easily $2,500 apiece" from the income under Continental's operation. He said Taylor originally wanted a longer term lease but it was decided on five years to start with, to see how it worked out, and if it was doing

well Midcity would give them a five year extension. When the monthly checks failed to come up to expectations Taylor told him it was due to seasonal business and that when school was out, he, Taylor, felt sure that they would have lots of business.

Frank R. Rizer, Secretary-Treasurer of Midcity, testified that Taylor represented to them that he could gross from $2,500 to $6,000 per month on this property, and that he so stated because he thought he could do so through his experience and through his knowledge of that type of business. Rizer said he believed the statement and relied upon it.

It is to be observed, that appellee waived or abandoned all other grounds of fraud save and except the alleged representations concerning the future use of the warehouse space so as to produce an average income of a certain income of money.

Of course, it is elementary, that to establish the elements of actionable fraud such must be shown by full, clear and satisfactory proof. Fraud is never presumed and when it is alleged, the facts sustaining it must be clearly shown. Fernandez v. Cano, Tex.Civ.App., 108 S.W.2d 310; Whitsel v. Hoover, Tex.Civ.App., 120 S.W.2d 930.

Both parties refer to and rely upon the case of Chicago, T. & M. C. Ry. Co., v. Titterington, 84 Tex. 218, 19 S.W. 472, 473, and after a careful review of that case we are of the opinion that it is the controlling decision of the facts of the instant appeal. In the Titterington case the charge of fraud was that the railway company had represented to the landowner that if a deed to the land was given the railway company would not only erect its railway lines across the land, but would establish and maintain a passenger and freight depot thereon. After the deed was signed no depot was ever built and no effort was made to do so. Suit was to cancel the deed for fraud and the question of necessary pleading and

proof of intent was discussed by the Supreme Court:

"This brings us to the consideration of the question of fraud and limitation. It is contended by the appellants that the plaintiffs' allegations of fraudulent representations do not show any fraud, in legal contemplation, but only false promises to do something in the future, for the non-performance of which an action for damages might lie, or for specific performance, but would not give any legal ground for the recission of the contract. No exception was interposed to the sufficiency of the allegations as formal averments of the fraud and of the facts constituting the same. We shall therefore consider the allegations as sufficient to show the character of the acts and representations relied upon as constituting fraud, and as disclosing the intention of the parties at the time of the execution of the ·deed. We concede that ordinarily a promise to perform some act in the future, although made by one party as a representation to induce the other to enter into the contract, will not amount to fraud in legal acceptation, though subsequently the promise is, without any excuse, entirely broken and non-fulfilled. This is a plain and well-established proposition, about which there can be no controversy; otherwise every breach of a contract would amount to fraud. Bigham v. Bigham, 57 Tex. 238; 8 Amer. & Eng.Enc.Law, p. 637, note 1. To the above rule, however, we think that there is well-founded exception, though there is a conflict in the authorities upon the question. It has been distinctly recognized and announced by the supreme ·court, however, in this state. The exceptions may be stated as follows, and in reference ·to the case in hand: ·If the railway company, at the time made the representations and promises before mentioned to the plaintiffs, did so with the design. of cheating and deceiving the plaintiffs, and had no intention at the time of performing the promises, but used them merely as false pretenses to induce the plaintiffs to execute the deed, *and if its conduct did have that effect,* then we think that such acts and declarations, *coupled with its subsequent utter failure and refusal to perform the promises or assurances,* would amount to such actual fraud as would authorize the plaintiffs to have the contract rescinded and the land restored to them. But, upon the other hand, if the promises or representations were made in good faith at the time ·of the contract, and the defendant subsequently changed its mind, and failed or refused to perform the promises, then such conduct of the company, originally or subsequently, would not constitute .such fraud, in legal acceptation, as would justify the recision of the contract or the cancellation of the deed. We rest our decision upon the following authorities, beginning with the decision of our own supreme court in an analogous case, which is directly in point, and in principle cannot be distinguished from the present controversy. Henderson v. [San Antonio & M. G.] Railroad Co., 17 Tex. 560; Dowd v. Tucker, 41 Conn. 197; Wilson v. Eggleston, 27 Mich. 257; Gross v. McKee, 53 Miss. 536; Shrewsbury v. Blount, 2 Scott.N.R. 588. *Whether the intention to cheat and defraud existed at the time of the making of the contract was a question of fact for the jury, and they might well have inferred that the railway company in fact had no intention at that time of establishing the depot on the plaintiffs' land, from the fact that thereafter it did not even make a pretense of complying with the contract in this particular."* (Emphasis ours). ·

██ ·.It seems to us that appellee Midcity, from the beginning, contended that intent was a necessary element of its cause of action for alleged ·fraud. In paragraph

VII of its trial pleadings Midcity specifically alleged that Continental made the representations with the "design and intention" of deceiving the executives of Midcity. Being an essential part of its cause of action, and, as said by the Supreme Court in the Titterington case, being a question of fact for the jury, it became encumbent upon appellee Midcity to secure a finding on this issue of fact, based upon competent evidence. Actionable fraud was the independent ground of recovery by Midcity against Continental. One of the elements of actionable fraud was that of fact of the intent or bad faith on the part of Continental which lead to the execution of the lease agreement. It is fundamental in our jurisprudence that in a jury trial one must submit to a jury and secure a finding thereon of all independent grounds of recovery. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.2d 1084. Judge Sharp, of the Supreme Court, in Wichita Falls & Oklahoma Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79, 85, sets forth the rules governing the submission of independent grounds of recovery and the authority of the court to make findings on those grounds not submitted, as follows:

"* * * But if the trial court should fail to submit one or more of such component elements of an ultimate issue, such component element, or elements, not submitted and not requested to be submitted, are not waived, and the court may find the unsubmitted element, or elements, in such way as to support the judgment rendered by him, *if there is evidence to support such finding."* (Emphasis ours.)

This is now the effect of Rule 279, Texas Rules of Civil Procedure providing that where such ground of recovery of defense consists of more than one issue, if one or more of the issues is necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and answered by the jury, and one or more of such issues are omitted, without such request, or objection, *and there is evi-*

*dence to support a finding thereon,* such omitted issue or issues shall be deemed as found by the court in such manner as to support the judgment.

■ As stated above, in this case an essential element of the independent ground of recovery, namely actionable fraud, was that of the intention or bad faith on the part of Continental at the time the lease was signed. This element was not requested by appellee, nor was it submitted to and answered by the jury. On the other hand, appellant made no objection to the manner of submission of the independent ground of recovery which was submitted in Issue No. 1, and therefore waived its right to complain of the non-submission of the question. It follows, from the above authorities, that the trial court in this case was amply justified in making a finding, impliedly so, that Continental did not have the intention of carrying out its promise to use sufficient of the space to bring in the promised monetary return. This action on the part of the trial court is justified, *if there was evidence to support it.* The question, therefore, is whether the record before us reveals any evidence of probative force which would justify the implied finding on the part of the trial court in this case of an essential element of the independent ground of recovery.

■ We have carefully reviewed the entire statement of facts in this case and have considered the evidence both direct and circumstantial. Based upon our study of the record we are of the opinion that there is no evidence of probative force to demonstrate the presence of the essential element of actionable fraud, namely, lack of intent or bad faith. The reasonable construction and interpretation to be applied to the testimony, related above, is that Continental told Midcity that they needed certain storage spaces and that it thought that over a period of five years time the business would certainly justify a return of certain sums of money. This is nothing more than a hopeful or wishful expectation,

**62**

based upon past business experience. There was certainly nothing definite, nor could it be definite, in such promise concerning future use and future monetary returns. Such would necessarily have to depend upon the quantity of business produced. Now what did Continental do after the execution of the lease? Contrary to the action of the railway company in the Titterington case, supra, it did not sit idly by and do nothing in an effort to perform its agreement. It immediately moved into the premises, cleaned it up, prepared it for use. It spent several thousand dollars in advertising in both newspapers and radio media. It placed ads in the telephone directory and constructed signs on the premises. It placed one or more people in the premises and moved its offices therein. There is no evidence in this record but that Continental did all that it could, as reasonable business men, to bring in business and try to fill the space in the Midcity building on Parry Street. It would have been foolhardy for them not to have done so because, by the very terms of the lease contract, Continental would not have earned one dime unless Midcity earned a like sum. It was a business venture wherein both parties were to share equally in the income.

There being no evidence of probative force which would justify the trial court in making the implied finding on the essential element of actionable fraud, it necessarily follows that the judgment rendered herein by the trial court must fall.

We have carefully considered the question of whether the judgment must be reversed and remanded or rendered in the light of well-established rules announced in 4 Tex.Jur.2d §§ 911, 918, Appeal and Error—Civil cases. In this case appellee pleaded the necessary element of fraud but failed to support such pleadings with competent evidence. Appellee, in its brief, states frankly that the element of intent is essential, as in the Titterington case, supra, but argues the existence of issuable facts to support this element of fraud. Appellee states in its brief that the facts are practically undisputed. It does not seem to us that the case was not fully developed. The evidence, including many exhibits, is full and complete. The case, being fully developed, does not present one that should be remanded. We see no useful purpose in such action and therefore deem it proper to reverse the judgment of the trial court and here render judgment that plaintiff take nothing by its suit against defendant.

Reversed and rendered.